FILED

JUL 2 3 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re                                           Case No. 08-12513-A-7

JAMES J. WARD

        Debtor.
_____/            Adv. No. 08-1160

GARY L. DAVIS

        Plaintiff,

    vs.

JAMES J. WARD

        Defendant.
_____/

FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Trial in this adversary proceeding was held April 16, 2009.  Following trial, the parties

filed closing briefs, and the matter was deemed submitted June 15, 2009.  This memorandum

contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy

Procedure 7052 and Federal Rule of Civil Procedure 52.  This is a core proceeding as defined in

28 U.S.C. §157(b)(2)(I)..

The Underlying Law.

      Plaintiff's complaint sought relief under Bankruptcy Code § 523(a)(4) and

§ 523(a)(2)(A).  At trial, the parties stipulated that the plaintiff had not presented any evidence

regarding the claim under § 523(a)(4) and was no longer seeking relief under that section.  The

parties agreed that as to that claim, judgment could and should be entered for defendant.

      The witnesses and documentary evidence at trial all had to do with plaintiff's claim under

Bankruptcy Code § 523(a)(2)(A) that defendant's obligation to plaintiff is nondischargeable due

to "fraud."  Both parties agree on the elements of a claim under § 523(a)(2)(A).  Those elements

1    are:

2          A plaintiff must establish that:

3                (1) the debtor made the representation;

4                (2) at the time of the representation, the debtor knew it to be false;

5                (3) the debtor made the representation with the intent and purpose of deceiving

6    the plaintiff;

7                (4) the plaintiff justifiably relied on the representation; and,

8                (5) the plaintiff sustained a loss or damage as the proximate consequence of the

9    representation having been made.

10 See 4 Collier on Bankruptcy (15th ed. Rev.) at p. 523.08.

11          The parties also agree that plaintiff must prove each element of his case by a

12 preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279 (1991).

13          While the parties agree about the standard, they disagree about whether plaintiff has met

14 his burden of proof.

15 The Evidence.

16          Five witnesses testified.  The witnesses were Gary Davis (the plaintiff), Jenni Rogers,

17 Beni Ruth Hearnsberger, Wayne Davis, and James Ward (the defendant).  Additionally, Exhibits

18 1 through 27 were admitted.

19 The Testimony.

20          Gary Davis met James Ward at church related social activities.  In early 2002, Ward

21 constructed a "spec house" for Davis in Lindsay, California.  This project was done through

22 Ward's company, Northridge Construction Company.  The construction of the spec house was

23 satisfactory to Davis.  Although they had agreed that Ward would keep $5,000 above his costs in

24 completing the project, Ward eventually decided not to take the $5,000.  That gesture on Ward's

25 part made Davis think that Ward was a "good guy" with whom Davis could work.

26          When escrow on the spec house closed, Davis got about $120,000 from the project.  At

27 that point, he asked Ward if there was another real estate investment that he could do with Ward.

28 Ward said there was, and Davis then transferred to Ward $125,000 to invest in a development

1   project.

2       The project was a residential development on which, according to Ward, he planned to

3   build about 16 custom homes.   Ward told Davis the project consisted of five acres, and that he

4   would build sixteen home on it.  The project was called Madison Estates.

5       Ward also represented to Davis that the $125,000 that Davis gave him would be used to

6   purchase this real property.  The testimony about this point was conflicting.  Davis testified that

7   Ward told him that money from Davis would be used to purchase the real property.  Two other

8   witnesses also testified that Ward had told them that the money from Davis had been used to

9   purchase the real property.  Ms. Hearnsberger (who had formerly been married to Ward) testified

10  that Ward told her that the money from Davis was used to purchase the Madison Estates

11  property.  Ward told Davis's son the same thing.

12      On the other hand, Ward testified that he did not tell Davis that the $125,000 would be

13  used to purchase the property.  Instead, he testified that he told Davis that the $125,000 would be

14  used to pay the engineer on the property and also to make payments to the seller for the property.

15  The property had in fact already been purchased when Ward got the money from Davis.

16      On this point, the court generally finds Mr. Davis to be a more credible witness.  His

17  memory of what had transpired was better, and the court finds him more believable.

18      Ward also told Davis that he would guarantee that he would get $50,000 in profit if he

19  invested $125,000.  Ward also represented to Davis that he would give Davis a note and deed of

20  trust on the property.  On the other hand, Ward refused to put Davis's name on title to the

21  property.  According to Ward, he would not put Davis's name on title to the property because he

22  needed to be in total control of it.

23      Davis relied on Ward's representations.  And, as a result, he transferred $125,000 to

24  Ward.

25      The parties disagree about whether Davis's reliance was justifiable.

26      Davis has an MBA from Golden Gate University.  He has been with the Farm Credit

27  System since 1979.  He has been  a loan officer for the Farm Credit System specializing in

28  agricultural loans.  Some of those loans are secured by real estate and some are unsecured.  He

3

1   does not participate in profits in the loans.  On the other hand, he has worked on, according to
2   him, probably hundreds of real estate loans as part of the Farm Credit System.

3       Therefore, the question arises whether given that background, his reliance on Ward was
4   justifiable.  For reasons that will be set forth below, the court concludes that it was.

5       Ward made and delivered to Davis a promissory note in the amount of $75,000 dated
6   April 2, 2003.  He also made and delivered to Davis a check dated April 2, 2003, in the amount
7   of $75,000.  Ward told Davis not to cash the check.  He said the check was just on good faith for
8   Davis to have in case Ward had an accident or something of that ilk.

9       Ward also hand delivered to Davis a promissory note dated April 3, 2003, in the amount
10  of $125,000 with 10% interest signed by Jenni Hayes (aka Jenni Rogers).  He also gave Davis a
11  deed of trust on Madison Estates showing Davis as trustee and signed by Jenni Hayes.  Ward told
12  Davis not to record the deed of trust.  He told Davis not to record the deed of trust so that it
13  would be easier for him, Ward, to have the property rezoned.  In exchange, Ward agreed that he
14  would not let anybody else record a prior deed of trust on the property.

15      By the time Davis got the note from Jenni Hayes and the deed of trust made by Jenni
16  Hayes, he had already transferred $125,000 to Ward.

17      When Ward gave Davis the note and deed of trust signed by Jenni Hayes, Davis was
18  shocked.  He didn't understand why the note and deed of trust were signed by Hayes and not
19  Ward.  He talked to Ward about that, and Ward said to Davis that the reason he did that is
20  because the seller would not sell two adjoining parcels to the same person.  Therefore, according
21  to Ward, he put the property in Jenni Hayes' name.

22      In 2005, Davis and his son met with Ward to discuss the progress of the development.  At
23  that time, Ward said "I'll give you $75,000 in profit instead of $50,000 and I'll also build you a
24  house at my cost."

25      Ward represented to Davis that the project comprised five acres.  In fact, it comprised
26  about 4.3 acres.

27      Ward also represented to Davis that he needed to be in total control of the property so that
28  Davis's name could not be on the grant deed.  In fact, Ward arranged for two other people to hold

4

1  title to the property.

2      Ward also represented to Davis that Davis would have a first deed of trust on the

3  property.  Ward caused Hayes to execute a deed of trust in favor of Davis but persuaded Davis

4  not to record the deed of trust.  Ini fact, at that time, the property was already encumbered.

5      The note and deed of trust from Hayes were delivered by Ward on April 3, 2003, which is

6  the date that Davis gave Ward the last check comprising the $125,000 investment.

7      When Davis asked Ward why the parcel was in someone else's name, he said it was

8  because the seller would not sell adjoining parcels to one person.  He said "don't worry about it,

9  it's legal, it's legitimate."  Davis trusted Ward.

10     Davis knew that if he recorded his deed of trust, it would be necessary for him to sign off

11 on parcel maps and other development and zoning matters, and therefore he bought into the idea

12 that he should not be on title or a recorded deed of trust so that the property could go quickly into

13 development and he would not be an obstacle.

14     Jenni Hayes (Rogers) was asked by Ward to put the property in her name.  She said Ward

15 told her that was because the property was owned by one person and they wouldn't sell it to one

16 new owner.  According to Hayes, she did not execute the April 3, 2003 promissory note that

17 Ward delivered to Davis, that purportedly bears her signature..

18     Eventually, she executed a document transferring the property to Beni Ruth Hearnsberger,

19 Ward's then wife.

20     Beni Ruth Hearnsberger had married Ward for the second time in March 2005.  He told

21 her that he had used the money from Davis to purchase the property in question.  He also told her

22 that the reason he put part of the property in Jenni Hayes' name was because he had had a

23 secretary who embezzled money from him and therefore he hadn't made payments to the IRS and

24 in order to prevent the IRS from seizing property, he had to have the property put in other

25 peoples' names.

26     Ward's testimony contradicts that of the other witnesses.  He acknowledged that he had

27 already purchased the Madison Estates property before Davis invested.  According to him, he

28 wanted the money from Davis to help pay for engineering fees and to make payments to the

seller. Ward borrowed money from Huth to buy the property and gave Huth a first deed of trust on the property. He needed Davis's money to make payments to Huth. Ward testified that he always intended to pay Davis but the engineer took longer than usual to finish the map. He also testified that he didn't put the property in his name because he owed the IRS about $100,000 and so he had a practice of putting property in other peoples' names. According to him, the IRS had no problem with this way of proceeding. When Ward originally purchased the property, he had part of it put in someone else's name and the other part put in Hayes' name. Eventually he took it out of their names and put it into Beni Ruth Hearnsberger's name, who at that time was his wife. At that time, he was close to developing the property.

Ward testified that he doesn't think he told Davis he needed his money to purchase the property because he already owned the property.

As stated above, the court finds plaintiff to be a credible witness. Additionally, Beni Ruth Hearnsberger and Jenni Hayes Rogers were credible witnesses. Based on the testimony, the court finds that Ward represented to Davis that he was constructing a development of sixteen custom homes on a five acre parcel. He represented that Davis's money would be used to purchase the real property and that he would have a promissory note and a first position deed of trust. He represented that Davis's money would be used to purchase one half of the property.

At the time Ward made those representations, he knew they were false. The property had already been purchased and placed in other persons' names when he made the representations to Davis. Additionally, Hearnsberger testified that Ward told her that he used Davis's money to purchase the Madison Estates property. Also Wayne Davis, the plaintiff's son, testified that Ward told him that he had used Davis's money to purchase the real property.

From the testimony and the documentary evidence, the court finds that Ward made those representations with the intent to deceive Davis. He wanted Davis to invest $125,000 in the Madison Estates project. In order to invest in the project, Davis wanted some assurance. To give him that assurance, and to get the money, Ward told him that he would have a note and deed of trust and that it would be a first deed of trust on the property.

Davis justifiably relied on the representation. From Davis's point of view, this was a loan

6

from somebody that he had a social relationship with.  He had met Ward through church social activities.  He had just had Ward successfully complete a spec home for him.  When that project was finished, Ward even refused to take the $5,000 profit that he had originally agreed to take. All of this built up a great deal of trust and confidence by Davis.  Davis found Ward's representations about why he should not record the deed of trust to be credible with his experience that holders of deeds of trust had to sign off on various development points and he did not want to slow the project down.  Davis wanted to believe Ward, and he did.

As a result of the false representation, Davis sustained a loss in the amount of his investment of $125,000 plus interest at the legal rate from the date of the investment.

Based on the findings of fact and conclusions of law set forth herein, judgment will be entered for plaintiff on the claim for relief under 11 U.S.C. § 523(a)(2)(A) and for defendant on the claim for relief under 11 U.S.C. § 523(a)(4).  Counsel for plaintiff shall submit an appropriate form of judgment.

DATED:    7/23/09

WHITNEY RIMEL, Judge
United States Bankruptcy Court

7

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA ) 
                         ) ss.
COUNTY OF FRESNO )

       I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within above-entitled action; my business address is 2656 U.S. Courthouse, 1130 O Street, Fresno, California, 93721.  On July 23, 2009, I served the within document on the interested parties in said action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Fresno, California, addressed as follows:

Steven M. Koch, Esq.
1110 N. Chinowth Street
Visalia, CA 93291

David R. Jenkins, Esq.
P. O. Box 1406
Fresno, Ca 93716

       I certify (or declare), under penalty of perjury, that the foregoing is true and correct. Executed on July 23, 2009, at Fresno, California.

Kathy Torres, PLS

8